IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 05 CR 650 — 9 |
| | ) | |
| v. | ) | Judge Ronald A. Guzmán |
| | ) | |
| JEROME MURRAY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

### I. Background

Defendant, Antwan Daniels, seeks to suppress (1) 58 grams of heroin allegedly seized

from defendant after a traffic stop on January 26, 2005, (2) defendant's post-arrest statement that

an AK-47 was in his bedroom, and (3) the AK-47 recovered from defendant's bedroom on July

19, 2005. Defendant's first motion to suppress was dismissed without prejudice to allow

defendant to file an amended motion with specific concrete allegations within fifteen days.

Defendant filed an amended motion and an evidentiary hearing was held. The parties have

submitted briefs in support of their positions.

### II. Heroin Seized on January 26, 2005

#### A. Facts

Pursuant to a court-sanctioned wiretap of Jerome Murray, the government recorded

several thousand phone calls. In one such call, on December 28, 2004, Murray spoke with a

person known by the nickname "Sko" and during the conversation, "Sko" asked Murray "What's

happening," and Murray responded, "after the holidays." (Tr. 94.) The FBI did not know "Sko's" identity at the time the call was placed. (Tr. 125.) On January 14, 2005, Murray and "Sko" spoke on the phone again and, during the conversation, Murray told "Sko" that he was putting something together for him. (Tr. 97.) At the time of the call, the FBI still had not identified defendant as "Sko." (Tr. 127.) On January 25, 2005, at 2:58 p.m., Murray and "Sko" spoke on the phone about "Sko" being "in the rotation" and needed "fifty" and "a hundred." (Tr. 98.) A few minutes after this call, Murray called Oluwadamilola Are, who the FBI believed was a heroin supplier. (Tr. 99.) During the phone conversation, Murray told Are that he had just "hollared at my man, Sko." FBI Special Agent Jeff Cooper interpreted this conversation as Murray asking Are for heroin, although the term "heroin" was never used. (Tr. 99-100.)

Surveillance officers were on duty on January 25, 2005, and in radio contact with agents monitoring Murray's wiretap. (Tr. 25.) On that day, the surveillance agents were notified that Murray was planning to meet "Rocco," a suspected drug dealer, at 102nd and St. Lawrence. (Tr 26-27, 187.) They followed Murray to a location near 102nd Street and St. Lawrence in Chicago, Murray parked his car, and went into an apartment building. (Tr. 18, 26-27, 187.) Murray later came out of the apartment building and drove away. (Tr. 27.) At 5:56 p.m., Murray spoke with Are on the phone, and, during the conversation, Are told Murray that he was going to have "Rocco" meet up with "Sko." (Tr. 100-01.) Agents believed that "Rocco" was a person also known as "Little Morocco" who was a street-level narcotics dealer. (Tr. 100-01.)

At 6:23 p.m., Murray spoke with "Sko" on the phone and, during the conversation, Murray and "Sko" agreed to meet at the Rosebud Farms store located on 130th Street near

2

Altgeldt Gardens Housing Complex in Chicago. (Tr. 27,103,187.) The surveillance officers were notified and placed the area under surveillance. (Tr. 27.) At approximately 6:30 p.m., surveillance officers saw Murray drive into the Rosebud Farms parking lot, park his car, and sit in his vehicle. (Tr. 28, 188.) Approximately five minutes later, a silver Dodge Magnum drove into the parking lot and parked next to Murray's car. (Tr. 28, 189.) Defendant was identified by two surveillance officers as the driver of the Magnum. (Tr. 29, 189.) Murray met with defendant in the parking lot, and at approximately 6:56 p.m., Murray drove away. (Tr 31-32, 190-93.) The surveillance officers directed enforcement officers to make an "identification stop" on the Dodge Magnum when it left the Rosebud Farms parking lot. (Tr. 33, 238.) An "identification stop" occurs when the police follow a suspect who is driving a car, pull him over for any traffic violation he commits, and ask for his driver's license. (Tr. 34, 335.)

The enforcement officers soon located and followed the Dodge Magnum. (Tr. 239.) When the Dodge Magnum disobeyed a stop sign at 119th Place and State Street in Chicago, the officers pulled it over at 120th and State Streets, approached the car and asked defendant, who had been driving the car, for his driver's license. (Tr. 239-42, 309-10.) Defendant gave the officers his Illinois State Identification Card. (Tr. 242, 310.) The officers wrote down the information on the ID card and handed it back to defendant. (Tr. 242, 310.) They did not cite the defendant for the traffic violation or driving without a license. The surveillance log, which is supposed to reflect the observations of the surveillance officers, does not reflect that the traffic stop occurred.

On January 26, 2005, at 12:20 p.m., Murray and Are spoke on the phone and, during the conversation, they talked about someone meeting "Sko." (Tr. 104.) A few minutes later, Murray

3

and defendant spoke on the phone and, during the conversation, Murray told defendant that they were getting "it" ready for delivery. (Tr. 105.) At 1:04 p.m., Murray spoke with "Rocco" on the phone. At 1:28 p.m., Murray spoke with defendant and told him that he was getting the "gym shoes" ready. (Tr. 107.) At 3:43 p.m., Murray again spoke with defendant and told him that Rocco was going to meet him and then spoke of Walter Payton's jersey. (Tr. 108.) The surveillance officers were notified.

The surveillance officers found defendant in his Dodge Magnum at 4:18 p.m., and placed him under surveillance. (Tr. 197.) At 4:31 p.m., Murray spoke with "Rocco" and asked him whether he met with "Dude." (Tr. 109.) The information was relayed to the surveillance agents. (Tr. 41, 313.) At 5:18 p.m., Murray and "Rocco" again spoke and "Rocco" told Murray that he was trying to call "Sko" but the calls were going into voice mail. (Tr. 110.) A minute later, at 5:19 p.m., Murray called defendant and told him to make sure to answer his phone because "Rocco" was trying to contact him. (Tr. 112.) At 5:20 p.m., Murray called "Rocco" and told him to call defendant right then and arrange to give defendant "50." (Tr. 113.) At 5:23 p.m., surveillance agents followed defendant, who was driving the Dodge Magnum, to the Walgreen's located at 103rd and Michigan. (Tr. 42, 197, 315.) Defendant drove into the parking lot, parked his car, and waited. (Tr. 42, 197, 315.) One of the surveillance officers parked directly next to defendant's car. (Tr. 220-21.) Then, an SUV pulled into the parking lot and parked next to defendant's car. (Tr. 197.) The agents previously identified the SUV as belonging to "Little Morocco." (Tr. 199.) Defendant got out of the Magnum, got into the passenger seat of "Little Morocco's" car, and then, approximately thirty seconds later, got out and returned to his own car.

4

(Tr. 197.) The surveillance agents believed that they had just witnessed a drug transaction. (Tr. 197.)

When the defendant drove away in the Dodge Magnum, the surveillance officers followed him. (Tr. 45, 200.) Defendant began driving at a high rate of speed and passing vehicles by pulling into the lane for oncoming traffic. (Tr. 45, 200.) Traffic was heavy and it was snowing. (Tr. 45.) Two surveillance officers, CPD Officers Kelvim Blanks and Ronald Kimble, and the two enforcement officers, Officers Hill and Hamideh witnessed defendant's erratic driving. (Tr. 45, 200, 250, 316, 352.)

Enforcement officers pulled defendant's car over at 112th and Michigan Avenue, as the two surveillance officers watched. (Tr 47-48, 222, 226, 250, 318.) When the enforcement officers approached defendant's car, they noticed that he, who was the only person in the car, was moving around in the driver's seat and, despite the officers' instructions for him to show his hands, continued to fumble around at his waist and the center console of the car. (Tr. 251, 318.) Fearing that defendant might be reaching for a weapon, one of the officers opened the driver's side door, grabbed defendant by the arm, took him out of the car, and placed handcuffs on him. (Tr. 251-52, 294, 318-20, 355-56.) Officer Hamideh then observed a clear plastic bag protruding from defendant's waistband. (Tr. 252.) Hamideh asked defendant what was in his waistband, and defendant replied, "a little something." (Tr. 252, 320, 357-58.) Hamideh asked what defendant meant by "a little something," and defendant replied, "Heroin." (Tr. 252, 320-21, 357-58.) Officer Hamideh removed the plastic bag from defendant's waistband. (Tr. 253, 321, 358.) The officers then searched defendant and found his Illinois State Identification card and $300.00.

5

(Tr 253, 322.) The officers searched defendant's Dodge Magnum and found nothing. (Tr. 254, 322.)

After the officers finished searching the car, the defendant asked if they could "work something out" because he did not want to go to jail. (Tr. 254, 323.) The officers asked what defendant had in mind and the defendant offered to give them information about others. (Tr. 254-55, 323.) The arresting officers later gave defendant's heroin and Illinois State Identification Card to the surveillance officers. (Tr. 256.)

The typed version of the surveillance logs that were prepared from the handwritten logs reflected that defendant was identified as "Sko" on January 25, 2005, while the typed surveillance log for January 26, 2005, indicated at several locations "Surveillance personnel observed the silver Dodge Magnum vehicle driven by the unknown African-American male (possibly Daniels)." (Tr. 65-69, 275-77.) While speaking with Murray on the phone, defendant never used his own name and no one on the intercepted phone calls said that "Sko" was defendant, or used words such as "drugs," "narcotics," "cocaine," "heroin," or "marijuana." (Tr. 77,125-26, 130, 148.) Agent Cooper explained that in his experience drug dealers often use code words while speaking on the phone in case they are being recorded. (Tr. 173.) Agent Cooper's interpretation of the meaning of the code words and the conversations were no more than "educated guess[es]." (Tr. 126.)

Agent Cooper prepared an affidavit in support of a complaint in this case, and in the affidavit, indicated that defendant had been identified by his driver's license on January 25, 2005. (Tr. 454-55.) Agent Cooper, however, admitted that it was a mistake and that defendant was actually identified by his Illinois State ID card. (Tr. 454,457.) Agent Cooper testified that he

6

realized his mistake when he went back to look at the evidence and saw that the card recovered from defendant on January 26, 2005 was the Illinois State ID card and not an Illinois Driver's License. (Tr. 460.)

## B. Argument

Defendant claims that there was no legal justification to pull him over on January 26, 2005, and therefore, seeks the suppression of the 58 grams of heroin recovered from his waistband. The government argues that the detention, search, and seizure were proper for two alternative reasons.

First, the government argues that the agents had sufficient information to justify a limited detention. At the time of the defendant's arrest the officers knew the following: On December 28, 2004, Murray, a suspected drug dealer, spoke with defendant and defendant asked Murray "What's happening," and Murray responded, "after the holidays." On January 14, 2005, Murray told defendant that he (Murray) was putting something together for him (defendant). On January 25, 2005, at 2:58 p.m., Murray and defendant spoke on the phone about defendant being "in the rotation" and needing "fifty" and "a hundred." A few minutes after this call, Murray called Oluwadamilola Are, who the FBI believed was a heroin supplier, and told Are that he had just "hollared" at the defendant and asked Are whether he could get something for the defendant. Also on January 25, 2005 agents learned Murray was planning to meet "Rocco," a known drug dealer, at 102nd and St. Lawrence and was, in fact followed to a building near 102nd and St. Lawrence that afternoon. At 5:56 p.m., Murray spoke with Are on the phone, and, during the conversation, Are told Murray that he was going to have "Rocco" (a known street-level drug

7

dealer) meet up with the defendant. The defendant and Murray met at the parking lot of the Rosebud Farms between 6:30 p.m. and 6:56 p.m.

The next day, January 26, 2005, Murray and Are spoke on the phone and, during the conversation, they talked about someone meeting the defendant. A few minutes later Murray told defendant by phone that they were getting "it" ready for delivery. At 1:04 p.m., Murray spoke with "Rocco" on the phone. At 1:28 p.m., Murray spoke with defendant and told him that he was getting the "gym shoes" ready. At 3:43 p.m., Murray again spoke with defendant and told him that Rocco was going to meet him and then spoke of Walter Payton's jersey number. At 4:31 p.m., Murray spoke with "Rocco" and asked him whether he met with "Dude." Murray and "Rocco" again spoke and "Rocco" told Murray that he was trying to call defendant but that the calls were going into voice mail. A minute later, at 5:19 p.m., Murray called defendant and told him to make sure to answer his phone because "Rocco" was trying to contact him. At 5:20 p.m., Murray called "Rocco" and told him to call defendant right then and arrange to give defendant "50." At 5:23 p.m. defendant, drove the Dodge Magnum to parking lot of the Walgreen's located at 103rd and Michigan parked his car, and waited. Then, an SUV previously identified as belonging to "Little Morocco" pulled into the parking lot and parked next to defendant's car. Defendant got out of the Magnum, got into the passenger seat of "Little Morocco's" car, and then approximately thirty seconds later, got out and returned to his own car and drove away. Shortly after this he was detained.

Besides the fact that defendant was speaking to known and suspected drug dealers about getting delivery of something, that he was meeting with such persons, and that known and suspected drug dealers were discussing how to get the defendant back into the rotation and

8

prepare delivery of "gym shoes" to him as well as speaking of delivering quantities of "50" and "100" of some substance to him and referencing Walter Payton's jersey number, the officers also had their own knowledge from past experience of how drug transactions were arranged and how they occurred. As Agent Cooper explained, drug dealers often use code words while speaking on the phone. Therefore, the absence of explicit language relating to drug transactions was not surprising, and the use of terms like delivering "gym shoes," "50" and "100," and being "in rotation" and Walter Payton's Jersey numbers were interpreted by the officers as code for the transfer, quantity and price of drugs. The Court agrees that the use of code words and such veiled language is inconsistent with an innocent transaction. Based upon their observations of all of the communications and arrangements prior to the meeting with Rocco and of the meeting itself and their knowledge from previously investigated drug transactions, the law enforcement officers believed that when defendant and Rocco met for less than a minute in Rocco's car in the parking lot of the Walgreen's store, Rocco delivered a quantity of heroin to the defendant.

The government, apparently conceding that this is not sufficient to establish probable cause for an arrest, argues that the encounter with the defendant on January 26, 2005, at least initially, was not an arrest, but a mere stop for which only a reasonable suspicion is required. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). This Court has no trouble concluding that the officers had specific and articulable facts sufficient to give rise to a reasonable suspicion (as opposed to probable cause) that defendant had just accepted delivery of a controlled substance and was committing the crime of possession of a controlled substance at the time his vehicle was stopped. The more difficult question is whether the stop of defendant's vehicle can properly be considered a *Terry* stop.

9

Certainly the circumstances under which this stop took place are far from the circumstances which led to the creation of the *Terry* stop exception to the requirement for probable cause. In *Terry*, the defendant was observed engaging in behavior which an experienced law enforcement officer concluded was "casing a job, a stick-up." *Id.* at 6. Furthermore, in *Terry* the constitutional seizure occurred when the officer "frisked" the defendant as a measure of self-protection after having approached him and asked him questions on the street. However, it appears that the scope of the permissible *Terry* stop has, for better or for worse, been greatly expanded beyond the original stop-and-frisk situation:

> [I]t is also clear that not all seizures of the person must be justified by probable cause to arrest for a crime. Prior to *Terry v. Ohio*, supra, any restraint on the person amounting to a seizure for the purposes of the Fourth Amendment was invalid unless justified by probable cause. *Dunaway v. New York*, 442 U.S. 200, 207-209, 99 S.Ct. 2248, 2253-2254, 60 L.Ed.2d 824 (1979). *Terry* created a limited exception to this general rule: certain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a person has committed or is about to commit a crime. In that case, a stop and a frisk for weapons were found unexceptionable. *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), applied the same approach in the context of an informant's report that an unnamed individual in a nearby vehicle was carrying narcotics and a gun. Although not expressly authorized in *Terry*, *United States v. Brignoni-Ponce*, 422 U.S. 873, 881-882, 95 S.Ct. 2574, 2580-2581, 45 L.Ed.2d 607 (1975), was unequivocal in saying that reasonable suspicion of criminal activity warrants a temporary seizure for the purpose of questioning limited to the purpose of the stop. In *Brignoni-Ponce*, that purpose was to verify or dispel the suspicion that the immigration laws were being violated, a governmental interest that was sufficient to warrant temporary detention for limited questioning. Royer does not suggest, nor do we, that a similar rationale would not warrant temporary detention for questioning on less than probable cause where the public interest involved is the suppression of illegal transactions in drugs or of any other serious crime.

*Florida v. Royer* 460 U.S. 491, 498-99 (1983). *See United States v. Cordell* 723 F.2d 1283,

1285 (7th Cir.1983) (following *Royer* to uphold an investigatory stop on suspicion of drug

trafficking in an airport.)

The government has also cited *United States v. Vega*, 72 F.3d 507 (7th Cir. 1995)

(improperly cited as *United States v. Vega*, 72 F.2d 180 (7th Cir. 1991)). In *Vega,* the Seventh

Circuit sanctioned a *Terry* stop in a situation involving a lengthy investigation and a stop of an

automobile on the basis of reasonable suspicion that the automobile was transporting a controlled

substance. The bulk of the discussion in that case pertained to whether the "stop," because of its

length and manner, which included handcuffs, removal from the automobile and the use of drug

sniffing dogs which had to be called to the scene, went beyond the " brief detention which gives

officers a chance to verify (or dispel) well-founded suspicions that a person has been, is, or is

about to be engaged in criminal activity" authorized by *Terry. Id.* at 515. The *Vega* court was

reluctant to sanction such a long and intrusive detention on mere suspicion:

> Nevertheless, we have over the years "witnessed a multifaceted
> expansion of Terry. . . . For better or for worse, the trend has led to
> the permitting of the use of handcuffs, the placing of weapons and
> other measures of force more traditionally associated with arrest
> than with investigatory detention." *United States v. Tilmon*, 19
> F.3d 1221, 1224-25 (7th Cir.1994). "Unfortunately, the line
> between a lawful Terry stop and an unlawful arrest is not bright."
> *United States v. Smith,* 3 F.3d at 1095.

*Id.*[1]

---

[1]In addition, the Seventh Circuit upheld the trial court's decision to suppress a portion of
the statements the defendant made after he was detained, because, though defendant was not
under arrest when the statements were made, at a certain point – presumably when the
investigatory stop proceeds beyond a brief detention which gives officers a chance to verify (or
dispel) well-founded suspicions that a person has been, is, or is about to be engaged in criminal
activity – questioning runs afoul of the Fifth Amendment's restrictions on custodial interrogation

The definition of an investigatory stop utilized in these cases, a brief detention which gives officers a chanced to verify (or dispel) well-founded suspicions that a person has been, is, or is about to be engaged in criminal activity, fits the facts of the case before us. The officers, as pointed out above, had well-founded suspicions that when the defendant met with Rocco for no more than a minute in Rocco's car, he received a quantity of heroin from him. Their stop of the defendant's car was for the very purpose of attempting to verify those suspicions.

Furthermore, the scope of the January 26, 2005 stop was reasonable given the circumstances. The police had a well-founded suspicion that they were stopping a narcotics dealer and they had observed him making movements with his hands around his waist and at the center console of the car as they approached and after they had instructed him to show his hands. This is more than enough justification to take the reasonable steps for their own protection that the officers took. In the course of protecting themselves, they observed the plastic bag which the defendant admitted contained heroin. At that point, there was probable cause to arrest and to seize the plastic bag containing the contraband. The officers' actions subsequent to stopping the defendant's automobile where reasonable and consistent with the limited objective of an investigatory stop. *See United States v. Askew*, 403 F.3d 496 (7th Cir. 2005) (holding that stop of defendant's car while he was driving through a parking lot on reasonable suspicion of engaging in a drug transaction was a permissible *Terry* stop); *United States v. Fiasche*, No. 05 CR 765, 2006 WL 695395, at *5-6, (N.D. Ill. Mar. 10, 2006) (holding that stop of defendant's automobile on reasonable suspicion of transporting drug proceeds based upon corroborated information from an informant was permissible under *Terry*). Because the stop of the defendant's car was a proper

unless *Miranda* warnings are given. *Id.* at 516.

12

*Terry* stop based upon a well-founded suspicion that the defendant was engaged in criminal activity, the Daniels' motion to suppress his statements and the heroin recovered from his person is denied.

The government posits as an alternative justification for the stop that defendant committed traffic violations by driving at a high rate of speed in heavy traffic and passing vehicles in an erratic manner in unsafe conditions. This also is a lawful basis for both the identification stop on January 25, 2005 and the subsequent stop on January 26, 2005. Defendant argues that such stops are unconstitutional, especially when the police routinely conducted them to gather identification information to further an investigation.

But that issue was decided some time ago. As the government points out, if the police had a lawful basis for stopping the defendant's vehicle, the fact that they also had an ulterior motive to do so does not "serve to strip the agents of their legal justification." *See Whren v. United States*, 517 U.S. 806, 810 (1996) (involving an "ulterior motive" to stop a defendant when the officers had probable cause to believe that a traffic violation had occurred). That law enforcement has now incorporated the use of traffic stops as part of their standard operating procedure to gather identification information in support of investigations of criminal drug conspiracies, should surprise no one. Indeed, for better or for worse, the reasoning in *Whren* makes such a development almost inevitable.

### III. Post-Arrest Statement on July 19, 2005.

**A. Facts**

On July 19, 2005, FBI agents and Chicago Police Officers went to defendant's home to place defendant under arrest pursuant to a valid arrest warrant. (Tr. 366-67, 406-07.) At that time, FBI agents knew that the arrest warrant alleged defendant's participation in a drug conspiracy and, thus, had probable cause to believe that the defendant was a drug dealer. (Tr. 370-71.) The agents also knew that defendant's criminal history involved several arrests and convictions for drug and weapons offenses. (Tr. 370-71.) At approximately 6:00 a.m., the officers approached the single-family home and knocked on the front door. Ebony Daniels, defendant's wife, answered the door. (Tr. 371, 408.) The agents identified themselves and announced that they were there to execute an arrest warrant for defendant and inquired whether he was in the house. (Tr. 371.) Mrs. Daniels told the agents that defendant was in the bedroom, and pointed to where the agents could find him. (Tr. 372, 408, 438.) Agents entered the house and went to the master bedroom. (Tr. 372, 438.) On their way to the master bedroom, Chicago Police Officers, who were assisting the FBI by conducting a protective sweep of the house, found two children, ages 8 and 3, in another bedroom and brought them out into the living room. (Tr 376, 409, 463.)

FBI agents went to the master bedroom and found defendant in bed. (Tr. 373, 440.) Defendant was placed under arrest and handcuffed at 6:04 a.m. (Tr. 374, 440.) He also was then brought out to the living room. (Tr. 378, 410, 440.) Before being given his *Miranda* warnings and before any other questions were asked, the defendant was asked if there were any weapons in

14

the house. He replied that there was an AK-47 (assault rifle) under the dresser in the bedroom. (Tr. 411, 441.)

Defendant argues that the answer to this question, posed while he was in custody, under arrest and without having been advised of his *Miranda* rights, should be suppressed along with the fruits of the unconstitutional interrogation. The government contends that the pre-*Miranda* interrogation falls under the public safety exception to the *Miranda* rule established by *New York v. Quarles,* 467 U.S. 649 (1984) and cites *United States v. Simpson*, 974 F.2d 845 (7th Cir. 1992) in support of this contention.

However, the *Simpson* case involved a significantly different fact pattern. In *Simpson*, the police were inside an apartment responding to a domestic disturbance call and were informed that the defendant (Simpson) had threatened someone in the apartment with a gun and left the apartment with a gun in his possession. As the officers spoke to the victims, the defendant returned to the premises without the gun. After verifying the existence of 22 caliber ammunition in the dresser drawer from which the defendant was said to have taken the gun, one of the officers asked the defendant if he owned any weapons. The defendant answered that the only gun he owned was behind the couch; whereupon the officer retrieved a 22 caliber rifle from behind the couch. Prior to trial, the defendant moved to suppress this statement.

Without deciding whether the defendant was in fact in custody at the time the question was asked (thereby triggering the *Miranda* requirements), the Seventh Circuit ruled:

> Assuming, without deciding, that Simpson was in custody, the
> statement nonetheless was admissible. Under *New York v.
> Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984),
> considerations of safety to law enforcement officers and others
> nearby justify an officer's inquiry about the location of a gun

15

> without first advising a suspect of his *Miranda* rights. *Id.* at 651,
> 104 S.Ct. at 2628. *See also Anderson v. Thieret*, 903 F.2d 526, 531
> (7th Cir. 1990). In this case, Cunningham was in Simpson's
> apartment responding to a domestic disturbance involving a gun.
> In addition to the two women who answered the door, he observed
> two small children inside the apartment. He was told that Simpson
> left the apartment carrying a gun; when he returned he no longer
> had it. The question was appropriate under the circumstances, and
> Simpson's answer properly was admitted at trial.

*Id.* at 847. The issue before this Court is whether the same question is appropriate under the circumstances of this case.

On the one hand, the situation in this case is about as safe as a warrant execution inside an offender's home can be. The defendant was clearly in custody, and restrained by handcuffs, when he was asked whether he had any guns. Moreover, when they questioned defendant, the officers had no specific information about any particular weapon and had control over all of the known occupants of the premises. Under these circumstances do considerations of public safety override the need for the prophylactic use of the *Miranda* warnings? This Court believes that the answer is yes.

Executing an arrest warrant at a suspect's home is an inherently dangerous undertaking. Even under the circumstances of this case, the officers involved in the execution of the warrant had cause for concern. First, the arrest warrant established probable cause to believe that the defendant was engaged in drug trafficking and the defendant's criminal history involved prior arrests for possession of drugs and weapons. This alone is sufficient to give rise to a reasonable apprehension that the defendant was likely to have weapons available to him – and where else if not in his home? *See United States v. Serna-Barreto*, 842 F.2d 965, 967 (7th Cir. 1988). Second, the home had not been thoroughly searched so that any weapons that did exist could be

16

hidden anywhere, even within reach of the handcuffed defendant or his family members. Such events can happen quickly and it would take only momentary carelessness by the officers to allow the defendant or a family member to obtain possession of a weapon located in the room in which they were being held. Finally, because the home had not been thoroughly searched, the possibility that an unknown person was on the premises could not be completely discounted. The officers were involved in the lawful execution of a valid arrest warrant and were entitled to take reasonable measures for their own safety. Thus, under the circumstances, they appropriately asked Daniels whether he had any guns, and his answer may, if otherwise appropriate, properly be admitted at trial.

## IV. Recovery of the AK-47 on July 19, 2005

### A. Facts

Immediately after defendant was arrested in his bedroom, Special Agent Helen Dunn returned to the front of the house and spoke with Mrs. Daniels who was in the dining room. (Tr. 374-75.) Agent Dunn again identified herself and explained to Mrs. Daniels why the FBI had come to her house. Mrs. Daniels told agent Dunn that she lived at the home, which was rented, with the defendant and two children and that only her name was on the lease. The remaining testimony concerning the search of the home is in substantial conflict. Taking into account the different versions of events and the credibility of the testimony, the Court finds that no search of the home took place until after the defendant informed the officers that there was a weapon under the dresser in his bedroom. The Court further finds that the initial search of the home ceased when the rifle was recovered from the closet in the defendant's bedroom. Before finding the

17

rifle law enforcement officers searched under and behind the defendant's bedroom dresser and, failing to find the rifle where the defendant indicated it would be, the officers then searched defendant's closet. The rifle was found on the floor of the defendant's closet, approximately three feet from his dresser.

The government contends that the search of defendant's bedroom closet for the rifle was permissible under the exigent circumstances exception to the rule requiring search warrants. The Supreme Court has allowed warrantless searches when police have a reasonable belief that exigent circumstances require immediate action before a warrant can be secured. *Michigan v. Tyler*, 436 U.S. 499, 509 (1978). *See also United States v. Lenoir*, 318 F.3d 725, 730 (7th Cir. 2003); *United States v. Webb*, 83 F.3d 913, 916 (7th Cir. 1996). As the government points out, the Supreme Court has specified four types of exigent circumstances: (1) hot pursuit of a fleeing felon; (2) threat of imminent destruction of evidence inside a residence; (3) risk that the suspect may escape from the residence; or (4) an imminent threat to the life or safety of the police officers, persons located within the residence, or members of the public. *Minnesota v. Olson*, 495 U.S. 91, 100 (1990). *See also Lenoir*, 318 F.3d at 730; *United States v. Tibolt*, 72 F.3d 965, 969 (1st Cir. 1995). The exigent circumstances posited by the Government in this case are the fact that the defendant's spouse and children would remain in the house after the agents left with the defendant and would be free to retrieve the weapon thereby endangering lives of the agents as they exited the premises.

The Court agrees. Once the defendant informed the agents that an assault rifle was to be found in a particular area of the house, the officers certainly had a right to search that particular area. When the search of that area did not result in the recovery of the weapon, a further search of

18

a likely hiding place less than three feet away was not unreasonable in view of the danger that such a weapon posed to the officers. Had there not been a specific indication that a weapon existed in the home, or had the search gone further afield, the result might be different. But, given all of the circumstances, the officer's actions where a reasonable response to a reasonable belief that exigent circumstances in the form of an imminent threat to the life or safety of the police officers, persons located within the residence, or members of the public existed.

The government also argues that the search of the home which resulted in the recovery of the rifle was done with consent. The Court agrees that Mrs. Daniels' testimony that she believed she had to sign the consent and never bothered to read it is not credible given the plain language on the consent form ("I have been advised of my rights to refuse consent . . . I give this permission voluntarily . . . ."), her education, at least one year of college studies to be a paralegal, and the various portions of the form that she admitted filling out. In addition, Mrs. Daniels contradicted herself on numerous occasions with respect to the circumstances of the search and her consent. Thus, the Court finds that Mrs. Daniels voluntarily and knowingly consented to the search of her home.

However, what is not clear from the record is whether this consent was given prior to or after the rifle was recovered. The defendant was brought out of the bedroom and questioned about the presence of weapons at about the same time that Agent Dunn was asking Mrs. Daniels to sign the consent form. Moreover, the officers did not wait for the consent form to be signed before starting their search. As soon as the defendant said he had a rifle and told the officers where it was, they started to look for it. (That is not surprising, however, given the danger that such a weapon would pose to the officers.) But, from the testimony, the Court cannot tell, and

19

doubts that anyone actually knows, whether the weapon was actually recovered before, during or after Mrs. Daniels signed the consent form. Because the two events were occurring simultaneously, is impossible to ascertain whether the pen was put to the paper before the gun was recovered from the closet, after it was recovered from the closet, or at the same time. Therefore, the record does not establish that consent to search the home existed at the time the weapon was recovered.

Presumably because of this problem in timing, the government also argues the applicability of the inevitable discovery exception to the exclusionary rule. As the government points out, the inevitable discovery exception to the exclusionary rule applies if the prosecution can establish, by a preponderance of the evidence, that evidence obtained through unlawful means inevitably would have been discovered through lawful means. *Nix v. Williams*, 467 U.S. 431, 444 (1984). *See also United States v. Cherry*, 436 F.3d 769, 772 (7th Cir. 2006); *United States v. Brown*, 328 F.3d 352, 357 (7th Cir. 2003).

Relying upon *United States v. Buchanan*. 910 F.2d 1571 (1990), the government argues that in this case FBI agents would inevitably have sought a search warrant for the premises based upon the defendant's statement that there was an assault rifle in his bedroom and a magistrate judge would clearly have issued such a warrant because there was probable cause and a fair probability that the evidence would indeed be found at the home. The Court agrees. For this reason also, the motion to suppress the AK-47 rifle is denied.

## Conclusion

For the reasons set forth above, Daniels' motions to suppress statements and evidence gathered as a result of the defendant's detentions on January 25 and 26, 2005, the defendant's arrest on July 19, 2005, and the search of his home on July 19, 2005 are denied.

**SO ORDERED.**                                    **ENTERED:**   1/5/07

**HON. RONALD A. GUZMAN**
**United States District Judge**